IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  09-cv-02786-MSK-BNB

Agile Safety Variable Fund, L.P. and Sky Bell Select LP,

Plaintiffs,

v.

RBS Citizens, N.A. d/b/a Charter One Bank and Swiss Financial Services, Inc.,

Defendants.

---

## SECOND AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiffs Agile Safety Variable Fund, L.P. and Sky Bell Select LP (collectively, "Agile" or "Plaintiffs") here sue defendants Swiss Financial Services, Inc. ("SFS") and RBS Citizens, N.A. d/b/a Charter One Bank ("Charter One") and allege as follows:

### INTRODUCTION

1.     Financial institutions Charter One and SFS (collectively, the "Defendants") succeed or fail based on their abilities to evaluate objectively the companies they administer and loan to.  But here the Defendants lost their objectivity, were willfully blind to their client's participation in a massive fraud, and then encouraged Agile to invest in that fraud.  The result was catastrophic loss for Agile—and catastrophic liability for Charter One and SFS.

2.     SFS and Charter One were administrators, lenders and/or advisers of Lancelot Investors Fund L.P. and Lancelot Investors Fund II, L.P. (collectively, "Lancelot").  Lancelot provided short-term, "purchase order financing" to entities owned or controlled by Thomas J. Petters ("Petters Entities") for "closeout" sales—transactions involving the purchase and resale

of excess consumer electronics inventory to large discount retailer like Costco Wholesale Corporation ("Costco").  Through transactions that Petters Entities allegedly brokered, Lancelot purchased promissory notes from the Petters Entities.  The proceeds from the sale of the notes were supposed to be used by the Petters Entities to purchase overstock inventory from certain sellers.  The Petters Entities purportedly resold the overstock merchandise to Costco or another reputable retailer, then repaid the notes with interest—earning Lancelot investors a significant profit.

3.      SFS and Charter One got involved early.  Based on a longstanding relationship with Lancelot's principal, Gregory Bell, Charter One established a "revolving line of credit" senior to all debt that Lancelot would later incur.  SFS established itself as an "administrator" of the Lancelot fund which, according to sales documents, became "responsible for the maintenance of the [Lancelot] Partnership's books and records and communications with limited partners." The more Lancelot's business grew, the more Charter One, as lender, and SFS, as administrator, stood to gain.

4.      Having established their interest in Lancelot, Charter One and SFS took on the role of recruiter for Agile.  To induce Agile's continued investment, Charter One and SFS repeatedly vouched for the legitimacy and credibility of Lancelot's investments with Petters, and made specific misrepresentations to Agile.  Charter One and SFS specifically trumpeted to Agile their own successes with Lancelot, their own due diligence and oversight over Lancelot and the Petters Entities, and the series of rigorous, ongoing audits and monthly bank reconciliations that Lancelot was subject to *at their own hands*.

5.      Defendants' representations were false.  Lancelot's investors were the victims of a massive $3.5 billion dollar fraud.  Virtually every Petters transaction Lancelot funded with

investors' money was fake.  There was no merchandise underlying the transactions and the purchase and sale documents related to these deals were fabricated.  Rather than financing "closeout transactions," Petters—with Lancelot and Bell's assistance—operated a massive Ponzi scheme that left investors like Agile holding worthless notes in excess of $230 million.

6.      Charter One and SFS knew that the financial transactions of Petters were fraudulent.  SFS admitted it in its own, direct misrepresentation to Agile:  there could be "[n]o issues with funny money movement – *we would know it.*"  This statement was knowingly false.  In fact, as SFS knew from its own maintenance of Lancelot's books and records and from its monthly calculation of Lancelot's net asset values, there *was* funny money movement—the transactions were all fake.

7.      Concerned only with their own fees from Lancelot, which increased as long as Lancelot grew, Charter One and SFS shut their eyes to Lancelot's involvement in the Petters fraud, and falsely represented that they were performing due diligence and monitoring they simply were not doing or were recklessly performing.  Had Defendants even scratched the surface of the diligence they committed to Agile to have already done and to continue to do over the course of Lancelot's operations—for example, asking to see the inventory allegedly owned by Lancelot or calling Costco to see if it ever bought *anything* from Petters Entities (which it did not)—the scheme would have come undone.  Had Defendants performed the rigorous auditing work they claimed to perform, there would have been no massive Ponzi scheme, and no massive victim.

8.      Defendants falsely told Agile that they were objectively monitoring Lancelot when in fact they had knowingly and recklessly taken on the role of Lancelot cheerleaders and sales agents. Agile relied on Defendants' misrepresentations when it invested in Lancelot, and

lost its entire investment.  By this action, Plaintiffs seek to hold Defendants responsible for their knowingly and recklessly false statements and willful blindness to the frauds perpetrated against innocent investors.

## JURISDICTION

9.      This Court has jurisdiction over all causes of action asserted in this Complaint pursuant to 28 U.S.C. §1332 because the damages sought are in excess of $75,000 and the Parties are diverse.

## VENUE

10.     Venue is proper in this court pursuant to 28 U.S.C. § 1391 because certain of the Plaintiffs have their principal place of business in Boulder, Colorado, and due to Defendants' conduct in and directed to Colorado, suffered the injuries that gave rise to the causes of action asserted in this Complaint in Boulder.  The remaining Plaintiffs suffered the same injuries from the same conduct by Defendants.

## PARTIES

11.     Plaintiff Agile Safety Variable Fund, L.P. is a Delaware limited partnership and has its principal place of business in Boulder, Colorado and made the investment decisions at issue in this action relying on Defendants' statements made to Agile in Boulder, Colorado.

12.     Plaintiff Sky Bell Select LP is a Delaware limited partnership and has its principal place of business in Hawaii and made the investment decisions at issue in this action relying on Defendants' statements made to Agile in Boulder, Colorado.

13.     Agile purchased limited partnership units in Lancelot relying on statements made by Defendants.  Agile made all of its due diligence inquiries and investment decisions that gave rise to the causes of action asserted in this Complaint from Boulder, Colorado.  All of

Defendants' statements identified in this Complaint were received by Agile in Boulder, Colorado. Agile suffered all of its injuries, which are in excess of $65 million, in Boulder, Colorado.

14.     Defendant SFS is an account administrative and accounting firm located in Naperville, Illinois. It is a division of Swiss Financial Services Holding AG. According to its web site, SFS "draws upon an extensive track record of proficiency, dependability and responsiveness," and strives to "provide competent and timely accounting and administration" services. Defendant SFS recklessly made affirmative material misrepresentations directly to Plaintiffs that induced their reliance and led to their loss of in excess of $65 million.

15.     Defendant Charter One is a division of RBS Citizens, N.A., a commercial bank subsidiary of Citizen Financial Group, Inc. ("CFG"). CFG is a $153 billion commercial bank holding company headquartered in Providence, Rhode Island and owned by Defendant Royal Bank of Scotland Group, plc. Defendant Charter One recklessly made affirmative material misrepresentations directly to Plaintiffs that induced their reliance and led to their loss of in excess of $65 million.

## STATEMENT OF FACTS

### I.     Lancelot: "Closeout" Financiers

16.     Lancelot was a hedge fund that purported to specialize in financing "closeout" sales—the transactions by which sellers get rid of excess inventory.

17.     In a typical transaction funded by Lancelot, Petters purportedly negotiated the purchase and resale of new, high-end merchandise (usually consumer electronics). Petters purportedly negotiated the terms of each exchange, entered into a purchase contract with the

original seller and a sale contract with the end-purchaser who, in turn, sold the merchandise to the public.

18.     Upon purportedly finalizing agreements for purchase and resale, Petters turned to Lancelot for "purchase order financing" to obtain the cash flow necessary to execute the exchanges.  Lancelot, through Petters-created special purpose vehicles ("SPVs"), executed promissory notes extending short-term loans that were used to purchase the excess inventory. The loans were designed to be repaid—at a premium—from the proceeds of the ultimate sale to an end purchaser.  The notes were generally 180 days in duration and paid annualized interest of 15% or higher.

19.     According to the verification of Defendants, no funds would be released to the SPVs unless the purchase and resale orders had been executed, and Lancelot had obtained title to and a UCC-1 secured interest in the goods, general casualty insurance on the goods, and creditor insurance on the end purchaser.  According to Defendants, these protections were in place as a precondition to any lending.  In fact, the protections did not exist.

20.     The Defendants purported to have a special relationship with Gregory Bell, the general partner and sole manager of Lancelot, who in turn had a special relationship with the primary broker, Thomas J. Petters.  All of the SPVs to which Lancelot through Mr. Bell made loans were owned and controlled by Petters, or his affiliated entities (collectively, the "Petters Entities"), all funds lent came with personal and corporate guarantees from Petters and/or a Petters Entity.

21.     Lancelot represented that it consistently financed deals with the same end purchaser, Costco, and it was these transactions that the Defendants vouched for and purported to verify.

## II.    SFS and Charter One: Overseers Of Lancelot's Funds

22.     Until October 2008, Lancelot was managed (directly or through other entities) by one individual: Gregory Bell.

23.     Because an operation as complex and diverse as Lancelot's—requiring confirmation of all securitizations, monitoring of the performance of a welter of loans both incoming and outgoing, and regular solicitation of new investment in the fund—required additional oars in the water, Lancelot enlisted the aid of the Defendants SFS and Charter One. Their roles proved critical in every aspect of Lancelot's operations.

### A.    SFS: "Administrator"

24.     SFS served as the "Administrator" of the Lancelot Fund since its inception in 2001. As Lancelot grew, SFS's work for Lancelot—and its accompanying fees—increased. SFS directly benefited from Lancelot's success because SFS's fees were based on the value of Lancelot's assets—the very same assets SFS was charged with objectively and independently valuing every month.

25.     According to Lancelot's financial statements, as Administrator, SFS was "responsible for the maintenance of the [Lancelot] Partnership's books and records and communications with limited partners." With SFS's knowledge, Lancelot prominently advertised SFS's role in its operations to investors and potential investors, including Agile. In public documents, SFS is listed as "responsible for the administrative functions of the [Lancelot] Fund, including, without limitation, maintenance of the Fund's financial books and records and communications with the Limited Partners." "The Administrator is responsible for certain matters pertaining to the administration of the Fund, including: (i) maintaining the financial books and records of the Fund, (ii) communications with the Limited Partners, including the

preparation and distribution of periodic performance reports of the Fund, (iii) coordinating the audit of the Fund's financial statements by independent auditors and (iv) calculating the Net Asset Value of the Fund and its Units."

26.     To perform its role, SFS had online access to all of Lancelot's accounts and purported to examine all of Lancelot's transactions. All fees, broker compensation and incentive allocations were verified by the administrator. In addition, SFS performed reconciliations twice per month, purporting to check Lancelot's financial records against its bank account activity.

27.     SFS's maintenance of the books comprised both controlling the in and outflow of money into Lancelot's investor accounts and monitoring those accounts and their performance. Specifically, SFS managed the custodial bank account where Lancelot investors deposited their funds, had to authorize and approve any cash flows from the custodial bank account, and transferred funds into a trading account controlled by Lancelot. SFS was the sole authorized signatory on the accounts.

28.     SFS knew, based on its monitoring of the accountants, reconciliations of the accounts and Lancelot's financial records that the Lancelot transactions were not legitimate. SFS knew that Enchanted Family Buying Co. ("Enchanted") and Nationwide International Resources ("NIR") were cycling money through Charter One and the Petters accounts purporting to be independent third parties, when in fact it these companies were actually Petters affiliates. These entities were simply laundering money through Charter One, all administered and monitored by SFS. SFS even admitted that if the transactions were fake, "we would know it." The transactions were fake and SFS and Charter One knew it.

29.     SFS's "communications with limited partners," *i.e.,* Agile and other Lancelot investors, included a duty to not negligently or recklessly misrepresent material facts.   SFS

7

knew that Agile would be relying on SFS as Lancelot's Administrator. However, SFS repeatedly made statements to Agile and other Lancelot's investors that were false.

30.     For example, Lancelot's offering materials stated that as Lancelot's Administrator, SFS was required to determine the Net Asset Value of Lancelot each month—*i.e.* to verify what Lancelot's assets were and how much those assets were worth.

31.     Also, on a monthly basis, SFS distributed account statements to Lancelot partners, reflecting the monitoring work it had performed. Both the statements and the Net Asset Value calculation were supposed to be performed in accordance with GAAP. But to comply with GAAP, SFS would have had to confirm the existence of Lancelot's assets—and Lancelot had none! Each of SFS's Lancelot valuations and financial statements was false and therefore made in violation of the duties SFS owed to the Lancelot's limited partners/investors, including Plaintiffs.

32.     SFS also was enlisted to communicate with potential investors, such as Agile. In that role, SFS made affirmative material representations regarding Lancelot, Bell and even Petters. Moreover, SFS touted its role in overseeing and ensuring the propriety of Lancelot's financial operations to induce continued investment by Agile.

33.     SFS's role at Lancelot—as both monitor of transactions and communicator with investors and potential investors—was vital. Investors like Agile understood that Lancelot "has limited operational abilities without significant use of the administrator." Agile relied on SFS's abilities when it made its investments in Lancelot.

**B.      Charter One: Banker**

34.     Charter One's role at Lancelot was just as critical.

35.     Having a longstanding relationship with Greg Bell, Charter One made Lancelot possible.  Charter One provided a revolving line of credit to Lancelot to smooth over cash flow deficiencies in operations and other fundraising.  Charter One's loan to Lancelot was senior to investment loans made by Agile.

36.     As a provider of senior debt, Charter One had a vested interest in Lancelot continuing to attract investment from Agile to pay Charter One's fees.

37.     Charter One therefore became both lender and cheerleader.  In a nod both to its relationship with Lancelot's principal, Mr. Bell, and to its own interest in attracting investment in Lancelot to pay its own fees, Charter One assisted in the recruitment of new investors and the continued investments of old ones.  Charter One made affirmative material representations regarding Lancelot and Bell's financial integrity, and Charter One's audits of Lancelot.  According to its representations to Agile, Charter One performed a twice a year audit of Lancelot's records to verify notes receivable, notes, and all material assets on Lancelot's books.  Indeed, Charter One distributed the results of its audit work to Agile and urged it to call anytime with questions about Lancelot.

38.     Its recruitment efforts were successful.  Backed by Charter One's institutional endorsement, Lancelot grew in each of the first seven years of its operation and Agile continued to invest.

39.     Charter One knew from monitoring the activity in its own accounts that the transactions were not legitimate.

III.    **Agile:  SFS and Charter One Acted in Concert with Petters and Lancelot to Induce Agile to Invest**

40.     Beginning in 2003, Agile purchased a limited partnership interest in Lancelot.  Relying on continuing representations from SFS and Charter One, Agile increased its investment

in Lancelot, including reinvesting its returns.  By late September 2008, when Lancelot collapsed, Agile and related affiliates had approximately $65 million in Lancelot and its related entities. Agile did not make the Lancelot investments lightly.  Upon initial inspection, the Lancelot *funds matched with Agile's* investment goals.  In materials distributed to investors, Lancelot represented that its investment goal was "attractive capital appreciation with rigorous risk control."  Consistent with this goal, Lancelot represented *that it made* loans "only in circumstances where the SPV has a pre-existing, binding agreement with a Retailer to sell the Underlying Goods to such Retailer on a future date (a 'Purchase Order')" and that "as a result of such Purchase Orders, the Fund will assume little or no inventory risk with respect to the Underlying Goods."

41.     Moreover, before investing in Lancelot, Agile conducted extensive discussions with, among others, SFS and Charter One.  Agile understood the key roles SFS and Charter One played in Lancelot's operations and undertook to understand the monitoring, auditing, administrative, and management functions they performed for Lancelot.

42.     Seeing an opportunity for Lancelot's—and their own—profits to grow, Defendants touted Lancelot and made assurances regarding Lancelot's and Mr. Bell's legitimacy.  Both SFS and Charter One portrayed themselves as objective watchdogs that had scrutinized Lancelot and Bell, and continued to closely monitor Lancelot's operations.  In fact, SFS and Charter One were simply Lancelot's cheerleaders, enlisted by Lancelot to reel in investors.

43.     SFS and Charter One therefore consciously conspired with Lancelot and Bell, and through them Petters, to enlist a common plan to induce Agile to invest in what SFS and Charter One knew, or were reckless and grossly negligent in not knowing, was a massive fraud.

44.     Moreover, both SFS and Charter One made numerous specific material representations to Agile to induce them to invest.  Both SFS and Charter One made these representations to Agile knowing that Agile would rely on them in connection with Agile's purchase of Lancelot securities.

45.     SFS and Charter One made several of these representations in telephone discussions with Agile's representative, knowing that Agile's business operations were based in Colorado, and that Agile's representative in the phone discussions was located in Boulder, Colorado.  As such, each one of their representations was knowingly and expressly aimed at Colorado.

46.     SFS made the following specific representations to Agile:

   a.  **SFS vouched for Lancelot based its own extensive initial due diligence.**  In Agile's interview with Joe Barone, chief executive officers of SFS, Mr. Barone represented that when SFS "first took Lancelot on as a client and looked at their strategy, they were a bit shocked with the interest rate on the loans and were skeptical, so they went out and did a lot of homework on the group."  According to SFS, the skepticism caused them to perform significantly more diligence than was typical.  After discussions with Lancelot's auditors and considerably more in depth review of the documentation, SFS represented to Agile that it had "a much higher level of comfort with the group."

   b.  **SFS gave Lancelot's principal, Greg Bell, a "great character reference".**  SFS made clear that its high level of comfort with Lancelot was based in significant part on the good character of Greg Bell.  SFS told Agile that Bell was "very detail-oriented" and "was very cooperative with SFS after they expressed

discomfort with what he's doing."  SFS also described Bell as "very morally conscious and reputable."

c. **SFS maintained that it had done due diligence on Petters.**  An SFS officer told Agile's representative that SFS "knew people who deal with Petters"—the man responsible for all of Lancelot's business—and had done "due diligence on Petters."  SFS also represented that it "also had the auditors visit them, and spoke with business counterparties of Petters."

d. **SFS claimed to verify all monies flowing through the company.**  SFS confirmed that SFS "acts as the funds administrator and custodian.  Part of the funds' structure is the Northern Trust account into which all monies flows.  These funds are only permitted to move to two places, either back to investors or to the SPV to initiate loans, with [SFS] as the sole authorized signatory on the account. Additionally, the administrator has access to and reviews all transactions processed through the operating account at ABN Amro . . . All fees, broker compensation, and incentive allocations are verified by the administrator, during its calculation of the monthly NAV of the fund."

e. **SFS represented itself as a key to Lancelot's operational abilities.**  Mr. Barone represented that "the administrator is built into the funds' operations and the fund has limited operational abilities without significant use of the administrator.  All fees are calculated and disbursed by the administrator, which is also responsible for NAV calculations."  SFS fostered the impression that it was and would be central to the decision-making and operational processes at Lancelot.

f. **SFS claimed to perform ongoing monitoring, including twice monthly reconciliations of the accounts.** Another SFS officer represented to Agile that "SFS looks at all transactions and performs monthly rec[onciliations]." The SFS officer indicated that SFS actually tried to do reconciliations twice a month since "they originate all loans and distributed the funds." The officer represented that SFS would "see[] the loan agreements" and was "overall comfortable with Lancelot because they have transparency into all the bank accounts."

g. **SFS represented that it could and would detect any fraud.** Finally, and most importantly, SFS made specific representations to Agile about fraud detection. When Agile's due diligence persons asked if a "bogus agreement" could be sent to them and pass through undetected, SFS stated that they "technically couldn't figure it out until three months later," but asserted that SFS would figure it out before that. SFS's diligence was laid plain. According to it, SFS "gets a workbook with what the loan docs should be in the middle of the month, and hard copies of the loan docs at the end of the month. SFS . . . checks the bank accounts (the custodial account and the lock-box account which is also held at Charter One) every two weeks and reconcil[es] everything. Everything needs to tie out, one way or another, and it's happened every month. No issues with funny money movement – *they would know it*."

47. Charter One made the following specific representations to Agile:

a. **Charter One vouched for the integrity of Bell.** Bernardo Lacayo of Charter One represented that while they don't typically lend to hedge funds, "[H]e's known Greg [Bell] since the days when he was a 10mm fund" and "looking for

13

senior debt to leverage that 10 mm." Mr. Lacayo maintained that Mr. Bell's character was a reason to have faith in Lancelot investments.

b. **Charter One represented that it performed regular due diligence on Lancelot**. Mr. Lacayo represented further that Charter One's parent, Royal Bank of Scotland Group plc ("RBS"), required Charter One to do a substantial amount of due diligence. He represented that "they did a healthy amount of due diligence" and "kept a very close eye" on Lancelot. Charter One also represented that because RBS required it, Charter One conducted its own "twice a year audit" in which it "checked the notes receivable, the notes, tie[d] it back, books a and records" and did a specific *"asset-based diligence."* Charter One represented that "every time they do a field exam, they outsource with what they consider an expert." Moreover, "at least one of the two exams a year is done by an internal person who has experience working with a finance company."

c. **Charter One detailed the auditing procedures that it performed to prevent or detect fraud.** Mr. Lacayo said that Charter One *"audit[s] everything that Lancelot tells us.* Every time the field examiners arrive, that's what they're doing. They do 20-25% actual confirmation, follow the cash flow into the account, and the cash outflow." He described the sampling methodology employed by the auditors: "The first time, it was very close to 100%. Then they stayed in the 50's and now they're in the 20's." He described the character of the audit team, noting that the review was allegedly conducted by "the head of our internal audit team, who has a background in lending to finance companies."

     **d.**  **Charter One represented that it had just completed an audit and everything checked out fine.**  In a conversation with Agile's due diligence representatives, Charter One went a step further, representing that "they were there a month ago" to conduct the audit.  Charter One forwarded the highlights of its field audit to Agile.  Charter One's "internal auditor" claimed to have conducted a review of twelve randomly selected notes totaling $232 million—nearly the entire portfolio! For each note, Charter One claimed to have audited notes, assignment agreements, pledged purchase orders, signed bills of sale from inventory suppliers, purchase orders from Costco, personal guarantees, UCC filings and insurance and produced a "completely clean opinion."

     48.    Finally, Charter One offered itself as a continuing resource to Agile.  In a conference call on July 31, 2007, Charter One representatives said that because they viewed Charter One's loan as an ongoing "liquidity line of credit," it continued to kept a close eye on Lancelot's business.  As to the "two audits a year" Charter One claimed it conducted, it "**gave Agile the green light**" to call Charter One "after every one" to verify the state of Lancelot's business.  Each and every representation made by SFS and Charter One was relied on by Plaintiffs in making their investment decisions in Lancelot.  In reliance on the affirmative assurances of SFS and Charter One, two entities responsible for the cash management of Lancelot's business and entities that held themselves out to Agile as ongoing monitors of the business and continuing resources available to investors—Agile invested in Lancelot with the expectation of a solid return with managed risk.  By the time the Lancelot fraud was discovered, Agile and related affiliates had invested at least $65 million in reliance on Defendants' representations.

## IV.     The Fraud at Lancelot

49.     SFS's and Charter One's representations regarding Lancelot's operations—and their monitoring of those operations—were false.  Contrary to their representations, Defendants did not conduct adequate due diligence.  If they had, they would have discovered that nearly all of Lancelot's business—the brokered purchase and resale of consumer electronics, the financing sales to Costco, the hundreds of millions of dollars of notes receivable allegedly owed to Lancelot—was fake, and predicated on a fraud perpetrated by Mr. Bell of Lancelot and Lancelot's chief deal supplier, Thomas Petters.  Lancelot and Bell were actively assisting the Petters fraud and engaging in precisely the kind of "funny money movement" Defendants avowed to detect and prevent.

50.     The fraud unfolded in stages.  On September 24, 2008, the FBI executed search warrants for the Petters Group Worldwide headquarters in Minnesota, and Petters' Minnesota home.

51.     Two days later, on September 26, 2008, the United States District Court for the District of Minnesota unsealed the Affidavit of Federal Bureau of Investigation agent Timothy Bisswurm ("FBI Affidavit") that supported the application for the warrant to search Petters' business and home.  According to that FBI Affidavit:

a.   The purchase and resale transactions purportedly brokered by the Petters Entities were fictitious;

b.   The Petters Entities never purchased merchandise from the purported seller companies, and never resold such merchandise to high-end retailers such as Costco;

    c.    The companies that purportedly sold the merchandise to Petters Entities were

        sham companies and/or companies that assisted the Petters Entities in their

        fraudulent scheme; and

    d.    The purchase orders and other documents in support of the transactions were

        entirely fabricated.

52.     On December 1, 2008, Petters was indicted by a federal grand jury, and charged

with twenty counts of wire and mail fraud, conspiracy and money laundering. Petters entered a

plea of not guilty. Further investigation revealed that the Petters fraudulent Ponzi scheme totaled

approximately $3.5 billion.

53.     Lancelot was ruined. Because "nearly all of the aggregate assets of Lancelot

Funds were committed to Petters financing," Lancelot began liquidation. On October 20, 2008,

Lancelot and its related entities filed for bankruptcy protection under Chapter 7.

54.     Bell initially claimed that Lancelot was an innocent victim of the Petters fraud.

However, on July 10, 2009, the SEC announced that it had filed fraud charges against Petters and

Bell in the U.S. District Court for the District of Minnesota.

55.     With respect to Bell, the SEC complaint charges that he lied to investors about the

steps Lancelot took to verify the brokered transactions it purportedly financed, and assisted

Petters in his fraudulent scheme by engaging in "roundtrip" payments to conceal the fact that

Petters had been delinquent for months in repaying the Lancelot-financed notes. As detailed in

the SEC complaint, beginning in or about February 2008, Bell and Lancelot or a related entity

sent money directly to a Petters Entity under the pretense that the money was for investment in a

new note. Petters then returned the money to Bell and Lancelot—usually on the same day—

packaged as the repayment of one of the outstanding debts owed to Lancelot. These "roundtrip"

transactions—totaling more than $1.2 billion between February and June 2008—were funded by Bell with investor money he was raising in the first half of 2008, including additional money invested by Agile.

56.     On October 7, 2009, Bell pled guilty to one count of wire fraud in the U.S. District Court for the District of Minnesota, admitting he engaged in the roundtrip transactions described in the SEC complaint.  Bell remains in federal custody awaiting sentencing.

## V.     SFS and Charter One's Role in the Fraud

57.     Petters and Bell did not act alone.  A fraud on this scale requires not only the help of active fraudsters, but also salesmen and cheerleaders—those who knowingly and recklessly abandon their objectivity and monitoring efforts and ignore the fraud occurring before their eyes.

58.     In its role as Lancelot's cheerleader, SFS made numerous misrepresentations to directly to Agile as well as those it made to all Lancelot investors.  The misrepresentations to Agile, detailed above, included that SFS: had "done a lot of homework" on Lancelot and had a high level of comfort with Lancelot and its operations; could vouch for Greg Bell; had conducted its own due diligence on Petters; and monitored Lancelot's finances in such a way that it would prevent and detect any "funny money movement."

59.     SFS's representations were false.  In fact:

a.   Had SFS done its "homework," it would have discovered that Lancelot was not taking the steps it purported to take to verify legitimacy of the brokered transactions it purportedly financed.

b.   Had SFS conducted adequate due diligence on Petters, it would have discovered that he had been convicted of multiple fraud related crimes, and had served time in prison.

18

c.  Had SFS conducted discussions with the counterparties in the Petters brokered purchase and resale transactions, it would have discovered that either they were not engaged in any such transactions (as in the case of Costco), or were sham corporations working with Petters in furtherance of his fraudulent scheme (as in the case of the purported merchandise sellers).

d.  Had Bell been the man of "great character" described by SFS, he would not have lied about the steps Lancelot took to verify the legitimacy of the brokered transactions, concealed his knowledge of Petters' past criminal convictions, and actively assisted Petters in promulgating the fraud by financing sham "roundtrip" transactions to conceal Petters' debts.

e.  Had SFS been able to detect "funny money movement" in Lancelot, SFS would have discovered the "roundtrip" transactions between Lancelot and Petters. These transactions carried on for at least four months—as Lancelot continued to attract more investments—without any notice by Lancelot's purported watchdog, SFS.

60.    As detailed above, Charter One made numerous representations directly to Agile, including that it had done a "healthy amount of due diligence" on the Lancelot Fund, and continued to keep a "very close eye" on it; conducted twice yearly audits on the Lancelot Fund, which examined "everything" the Lancelot Fund told Charter One; outsourced its audits to persons who Charter One considered "experts," and whose work included checking the receivables and the notes and tracing those back to the Lancelot Fund's books and records; and conducted asset-based due diligence and field exams. Charter One also attested to Bell's strong moral character.

61.    Charter One's representations were false. In fact:

  a. A "close eye" on Lancelot would have revealed that the purchase and resale transactions Lancelot funded were completely fictitious.

  b. Adequate asset-based due diligence would have uncovered that there were no actual assets underlying the fictitious transactions.

  c. Several of the documents "audited" by Charter One, including, for example, the purchase orders from Costco, were fabricated.

  62. Neither SFS nor Charter One performed the administrative, management, or monitoring functions promised to Agile.  As alleged by the SEC, "[n]o one ordered any merchandise through Petters Co.  All of the underlying documentation—purchase orders, bills of sales and assignments of security interests—had been fabricated by Petters and others acting at his direction."  A single visit to any of the nonexistent warehouses holding the billions in goods allegedly being transferred would have revealed that.

  63. Worse still, no level of "twice a month" reconciliation or twice yearly audit could have failed to detect that all of these transactions were fake.  As the SEC proved, a single phone call to Costco by the Defendants would have revealed that Costco had not purchased any goods from Petters in years!

  64. SFS and Charter One made their statements to Agile knowing their falsity and with a reckless disregard of the truth.  SFS falsely portrayed itself as an objective administrator that approached Lancelot with a healthy skepticism and conducted significant monitoring and due diligence of Lancelot—and Petters—to ensure the legitimacy of Lancelot's transactions.  Charter One falsely portrayed itself as keeping an especially "close eye" on Lancelot.

  65. In fact, SFS and Charter One were cheerleaders—focused on recruiting new Lancelot investors and willfully blind to the fraud occurring right before their eyes.

66.     SFS and Charter One knew that their false portrayals of rigorous due diligence and monitoring of Lancelot would mislead investors like Agile into a false sense of comfort regarding Lancelot's financial operations.

67.     SFS and Charter One made their false statements directly to Agile, knowing that Agile would rely on them when deciding to invest and maintain its investment in Lancelot. Agile justifiably relied on the direct representations made by SFS and Charter One when it invested and increased its investment in the Lancelot Fund.

68.     As a result of SFS's and Charter One's false representations, Agile lost its entire investment in the Lancelot Fund.  Agile and related affiliates had approximately $65 million invested in the Lancelot Fund at the time of its collapse, none of which has been recovered.

## FIRST CAUSE OF ACTION

(Negligent Misrepresentation Against SFS and Charter One)

69.     Agile repeats and realleges paragraphs 1-68 above as though fully set out in this claim.

70.     SFS and Charter One consciously conspired with Lancelot and Mr. Bell, and through them Petters, to enlist a common plan to induce Agile to invest in what SFS and Charter One knew, or were reckless and grossly negligent in not knowing, was a massive fraud.

71.     Moreover, both SFS and Charter One made numerous specific material misrepresentations to Agile to induce it to invest that SFS and Charter One knew, or were reckless and grossly negligent in not knowing, were materially false and misleading.  SFS and Charter One made such misrepresentations knowing that Agile would reasonably rely on those representations in connection with its investment in Lancelot and did so with the knowledge that the injury from that reliance would occur in Boulder, Colorado where Agile is located.

72.     Charter One and SFS made these representations, in the course of their business as the Lancelot's lender and administrator, respectively.

73.     Agile justifiably and reasonably relied upon Charter One's and SFS's representations.

74.     But for Charter One's and SFS's representations, Agile would not have made or maintained its investments in Lancelot.

75.     At a minimum, Charter One's and SFS's misrepresentations were negligently made.

76.     As a direct and proximate cause of Charter One's and SFS's misrepresentations, Agile has been damaged.

## SECOND CAUSE OF ACTION

### (Negligence Against Charter One and SFS)

77.     Agile repeats and realleges paragraphs 1-76 above as though fully set out in this claim.

78.     SFS and Charter One consciously conspired with Lancelot and Mr. Bell, and through them Petters, to enlist a common plan to induce Agile to invest in what SFS and Charter One knew, or were reckless and grossly negligent in not knowing, was a massive fraud. Moreover, both SFS and Charter One made numerous specific material misrepresentations to Agile to induce it to invest that SFS and Charter One knew, or were reckless and grossly negligent in not knowing, were materially false and misleading.

79.     Each of Charter One and SFS owed a duty of care to Agile, a duty not only inherent in their positions with Lancelot, but also as a result of their communications with Agile regarding Agile's investment.

80.     Charter One and SFS breached their duties of care and did so with the knowledge that the injury from that breach would occur in Boulder, Colorado where Agile is located

81.     As a direct and proximate cause of Charter One's and SFS's breach, Agile has been damaged in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

(Violation of Colorado Securities Laws Against All Defendants)

82.     Agile repeats and realleges paragraphs 1-81 above as though fully set out in this claim.

83.     The Lancelot investment units purchased by Agile are securities as defined by Colo. Rev. Stat. § 11-51-201(17).

84.     The offers and/or the sales of the units to Agile occurred in Colorado.

85.     The offers and the sales of the units to Agile violated the provisions of Colo. Rev. Stat. § 11-51-501(1), because the Defendants, and each of them, in connection with such offer and sale of the Lancelot investments to Agile, directly or indirectly, and by reason of the misrepresentations and omissions set forth herein: (a) employed devices, schemes, or artifices to defraud Agile, (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaged in acts, practices, and courses of business that operated or would operate as a fraud or deceit upon Agile.

86.     The violations by the Defendants, and each of them, described herein were committed recklessly, knowingly, and with an intent to defraud Agile.

87.     Agile did not know of the untruths or omissions described herein.

23

88.     SFS and Charter One made misrepresentations to Agile knowing that Agile was considering whether to purchase the investments offered by Lancelot and Agile did in fact purchase those investments in reliance on SFS and Charter One's misrepresentations. SFS and Charter One did so knowing at the time of the offers and sales of the Lancelot investments to Agile that another person or entity who offered or sold the Lancelot investments to Plaintiffs was engaged in conduct that violated Colo. Rev. Stat.§ 11-51-501(1) and gave substantial assistance to such conduct.

89.     Agile is entitled to recover from each of the Defendants, jointly and severally, under the provisions of Colo. Rev. Stat. § 11-51-604(3), 11-51-604(4) and 11-51-604(5), the consideration paid for the investments, less the amount of any income received on the units, upon the tender of the units, together with interest at the statutory rate from the date of payment, costs, and reasonable attorney fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Agile respectfully requests judgment against Defendants, under all applicable counts of action, as follows:

A.     Actual and consequential damages in an amount to be proven at trial;

B.     Punitive damages to the fullest extent permitted by law;

C.     Costs, expert witness fees pre- and post- judgment interest; and

D.     Any other relief the Court and/or jury deem just, proper and equitable.

## JURY DEMAND

Agile requests a trial by jury on all claims in this Complaint.

Dated:  August 5, 2010

/s/ Steven W. Thomas _____
Steven W. Thomas, Esq.
THOMAS, ALEXANDER & FORRESTER LLP
14 27th Avenue
Venice, California 90291
Telephone:  (310) 691-2536
Facsimile:  (310) 526-6852
Email:  steventhomas@tafattorneys.com

Steven M. Feder, Esq.
FEDER LAW FIRM
730 17th Street, Suite 550
Denver, Colorado  80202
Telephone:  (303) 221-5599
Facsimile:  (303) 221-7357
Email:  steve@federlawfirm.com

ATTORNEYS FOR PLAINTIFFS

### *Certificate of Service*

I hereby certify that on August 5, 2010, I electronically filed the foregoing Agreed

Motion with Defendant's Written Consent Pursuant to Federal Rule of Civil Procedure 15(a) to

Reflect the Correct Corporate Entity for Defendant d/b/a Charter One Bank with the Court using

the CM/ECF system, which sent notification of such filing to the following individuals:

Howard Schiffman
Schulte Roth & Zabel LLP
1152 15th Street N.W., Suite 850
Washington, D.C. 20015

David A. Zisser
Davis, Graham & Stubbs LLP
1550 17th Street, Suite 500
Denver, Colorado 80202

Attorneys for Defendant Citizens Financial Group

Robert B. Christie
Henderson & Lyman
175 West Jackson, Suite 240
Chicago, Illinois 60604

Attorneys for Defendant Swiss Financial Services, Inc.


THOMAS, ALEXANDER & FORRESTER LLP


/s/ Steven W. Thomas
Steven W. Thomas
14 27th Avenue
Venice, California 90291
Telephone: (310) 961-2536
Facsimile: (310) 526-6852
Email: steventhomas@tafattorneys.com

Attorney for Plaintiffs