**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 09-cv-02786-WJM-BNB

AGILE SAFETY VARIABLE FUND, L.P., and
SKY BELL SELECT, LP,

      Plaintiffs,

v.

RBS CITIZENS, N.A., d/b/a Charter One Bank, and
SWISS FINANCIAL SERVICES, INC.,

      Defendants.

---

**OPINION AND ORDER ON MOTIONS TO DISMISS AND
FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Swiss Financial Services, Inc.'s ("Swiss

Financial") Motion to Dismiss, ECF No. 44; RBS Citizens, N.A.'s[1] ("Charter One")

Motion to Dismiss the Amended Complaint, ECF No. 51, and Defendant RBS Citizens,

N.A.'s Amended Motion for Summary Judgment, ECF No. 166.

**INTRODUCTION**[2]

Plaintiffs Agile Safety Variable Fund, L.P. ("Agile") and Sky Bell Select LP ("Sky

Bell") allege Defendants Charter One and Swiss Financial induced Plaintiffs to continue

---

[1] This motion was originally filed as Citizens Financial Group, Inc.'s and the Royal Bank of Scotland Group PLC's Motion to Dismiss the Amended Complaint.  However, Defendant Citizens Financial Group, Inc. d/b/a Charter One Bank was substituted for RBS Citizens, N.A. to correctly reflect the corporate entity for Charter One Bank on Aug. 9, 2010, ECF No. 91, and Royal Bank of Scotland Group PLC was terminated as a party pursuant to Plaintiffs' notice of voluntary dismissal, ECF Nos. 66 and 71.

[2] Unless otherwise noted, the following facts are either undisputed or construed in Plaintiffs' favor.

to invest in Lancelot Investors Fund L.P. and Lancelot Investors Fund II, L.P. (jointly "Lancelot") through numerous specific material misrepresentations.  (*See* Second Amend. Compl. at ¶¶ 2, 4, 49; ECF No. 92.)  Lancelot turned out to be a massive Ponzi scheme as a result of which Plaintiffs Agile and Sky Bell and their related entities lost more than $65 million.  (*Id.* at ¶ 13.)

**Lancelot**

Lancelot consisted of two funds that provided purchase order financing to entities owned or controlled by Thomas Petters ("Petters") for transactions involving the purchase and resale of excess consumer goods to discount retailers such as Costco Wholesale Corporation.  (*Id.* at ¶ 2.)  Investors of Lancelot, including Plaintiffs, were "holders" of interests that were not for sale on an open market, such as shares of stock of a public corporation.  Lancelot investors earned a profit from repayment of the promissory notes by Petters.  (*Id.*)  Lancelot's manager was Gregory Bell ("Bell").  (*Id.* at ¶ 3.)

**Swiss Financial as Administrator**

Swiss Financial became involved with Lancelot as the fund's administrator in 2001.  (*Id.* at ¶ 24.)  According to the contract with Lancelot, Swiss Financial recorded Lancelot's transactions and produced financial statements.  (ECF No. 183 at 3.)  Swiss Financial had access to Lancelot's bank account statements and could view the activity conducted in those accounts.  (*Id.*)  Swiss Financial asserts that it had no duty to verify the underlying investments of Lancelot or the source of those investments.  (*Id.* at 4.)  According to Swiss Financial, "[a]s a matter of custom and practice, administrators have

no duty to verify the existence of collateral." (*Id.*)

In public documents, Lancelot listed Swiss Financial's duties as being "responsible for certain matters pertaining to the administration of the Fund, including: (I) maintaining the financial books and records of the Fund, (ii) communications with the Limited Partners, including the preparation and distribution of periodic performance reports of the Fund, and (iii) coordinating the audit of the Fund's financial statements by independent auditors and (iv) calculating the Net Asset Value of the Fund and its Units." (ECF No. 92 at ¶ 25.)  Swiss Financial made money from Lancelot based on the value of Lancelot's assets.  (*Id.*)

***Charter One as Bank***

Charter One first established a commercial relationship with Lancelot in 2005. (ECF No. 166 at ¶ 38.)  Charter One had a longstanding relationship with Bell and established a line of credit with him senior to all debt Lancelot would later incur.  (ECF No. 92 at ¶ 3.)  It was this financing which allowed Lancelot to fund its alleged goods purchases. *Id.*  Lancelot thereafter became Charter One's single largest client. (ECF No. 174 at 2.)

Charter One recruited Lancelot by promising to decrease the administrative burden and oversight of Lancelot as compared to its previous lender.  (*Id.* at 2.)  In decreasing the oversight, Plaintiffs allege, Charter One failed to follow up on warnings from field examiners who repeatedly warned Charter One's senior management to verify whether the underlying transactions were real.  (*Id.*)

***Agile's Investments***

Agile is a Delaware limited partnership with its principal place of business in Boulder, Colorado.  (ECF No. 92 at ¶ 11.)  In 2003, Agile purchased a limited partnership in Lancelot.  (*Id.* at ¶ 40.)  Agile made purchases of Lancelot interests on March 1, 2004, April 1, 2004, May 1, 2004, July 1, 2004, and November 1, 2004.  (ECF No. 166 at 10 ¶ 5.)  Agile alleges it continued to increase its interest in Lancelot by at first purchasing more shares in Lancelot, then by reinvesting its returns.  (ECF No. 92 at ¶ 40.)  Agile alleges that it made the decision to reinvest these returns following monthly meetings during which Agile reassessed its current investments.  (*See* ECF No. 174 at 8-9.)

In early 2007 Agile and related entities were questioning their investment in Lancelot and determined they needed additional due diligence done on these investments.  (*Id.* at 7.)  As part of Agile's due diligence, Agile spoke with Lancelot and was given permission to talk to Charter One about the results of a biannual field exam recently completed on Lancelot.  (*Id.* at 7.)  Through this due diligence effort, Agile alleges, it determined it would not redeem its investments but instead continued reinvesting in Lancelot.  (*Id.* at 9.)

***Communications between Plaintiffs and Defendants***

Charter One and Swiss Financial allegedly claimed to be monitoring Lancelot prior to the discovery of the fraud.  (ECF No. 92 at ¶ 7.)  Swiss Financial purported to provide monthly account statements to Lancelot partners based on its verification of Lancelot's assets and what they were worth.  (*Id.* at ¶¶ 30, 31.)  Plaintiffs allege,

however, that Swiss Financial never independently verified Lancelot's assets and thus failed to uncover the fact that Lancelot had no assets.  (*Id.* at ¶ 31.)

Plaintiffs further allege that during a conversation with Swiss Financial's chief executive officer Joe Barone, Agile was told that Swiss Financial was initially skeptical about Lancelot, but were assured that Swiss Financial had thoroughly reviewed Lancelot's financial documentation in depth and were comfortable with the fund following the investigation.  (*Id.* at ¶ 46(a).)  In another conversation, Plaintiffs allege, a Swiss Financial representative stated Swiss Financial saw all of Lancelot's loan agreements and were "comfortable with Lancelot because they have transparency into all the bank accounts."  (*Id.* at ¶ 46(f).)

Plaintiffs also allege Charter One vouched for Bell, citing a longstanding relationship.  (*Id.* at ¶  47(a).)  Plaintiffs assert that Charter One assured them it performed bi-annual, independent audits of Lancelot's records to verify notes receivable, notes, and all material assets on Lancelot's books.  (*Id.* at ¶ 37.)  Plaintiffs allege, however, that Charter One used internal field examiners instead of independent auditors to conduct said audits.  (ECF No. 174 at 8.)  Further, while Charter One claimed to be doing asset-based due diligence on Lancelot, Plaintiffs allege this was never done, given that Charter One did not discover the Ponzi scheme fraud through their audits.  (*Id.* at 8.)  Following an audit performed in July 2007, Plaintiffs allege Charter One assured Agile it had performed an independent audit, looking through the books and records, including a thorough asset-based due diligence audit.  (*Id.* at 8.)

Agile also asserts these material misrepresentations were communicated by Defendants to its representatives when said representatives were in Boulder, Colorado. (ECF No. 67 at 12).

**Sky Bell Formed**

Sky Bell was formed as a Delaware limited partnership on September 7, 2007, and proceeded to begin purchasing interests in Lancelot on September 28, 2007. (ECF No. 166 at 11 ¶¶ 14, 17.) Plaintiffs allege Sky Bell Asset Management, an affiliate of Agile, decided to form Sky Bell as a direct result of the assurances it received about Lancelot from Charter One. (ECF No. 174 at ¶ 26.) Sky Bell was formed, Plaintiffs further assert, "solely to invest in the Lancelot . . . funds based on critically important and dramatic due diligence representations made by Charter One and Swiss Financial." (*Id.*) Specifically, Plaintiffs contend that Sky Bell was formed and purchased interests in Lancelot just one month after Charter One provided Agile with information regarding Charter One's recent field exam of Lancelot. (*See* ECF No. 166 at 11 ¶ 17; ECF No. 174 at ¶ 26; Marks Decl., ECF No. 177; Marks Depo. 124:2-6, ECF No. 180-8.)

**Fall of Petters and Lancelot**

On September 24, 2008 the FBI executed search warrants on Petters' headquarters and his home. (ECF No. 92 at ¶ 50.) Petters was indicted by a federal grand jury based on allegations of fraud, including assertions that Petters never purchased merchandise for resale and that the purchase orders and other documentation of transactions were forgeries. (*Id.* at ¶ 51, 52.) Bell pled guilty to participating in the fraud. (ECF No. 166 at ¶ 47.)

Lancelot and its related entities filed for bankruptcy protection on October 29, 2008.  (*Id.* at ¶ 49.)  Its investors lost $3.5 billion.  (ECF No. 92 at ¶ 5.)  Charter One lost tens of millions of dollars.  (ECF No. 166 at ¶ 50.)  Agile and its related entities lost more than $65 million.  (ECF No. 92 at ¶ 13.)

In an effort to recover a portion of its losses, Plaintiffs assert three claims against Defendants:  (1) negligent misrepresentation; (2) negligence; and (3) violation of Colorado securities laws.[3]  The Court will first address in this Order Defendants' Motions to Dismiss, ECF No. 44 and 51, before ruling on Defendants's Motion for Summary Judgment, ECF No. 166.

## CHOICE OF LAW[4]

In diversity cases, federal law governs procedural matters, which include the standards for motions to dismiss and summary judgment, while state law governs the substantive issues.  *See Morris v. Travelers Indem. Co. of Am.*, 518 F.3d 755, 758 (10th Cir. 2008) ("In diversity cases, the laws of the forum state govern our analysis of the underlying claims, while federal law determines the propriety of the district court's summary judgment.").  To determine the state law that applies in this matter, the Court applies the choice of law rules of the forum state.  *AE, Inc. v. Goodyear Tire &  Rubber Co.*, 168 P.3d 507, 508 (Colo. 2007).  Colorado's choice of law standard is the "most

---

[3] Plaintiffs also had asserted a claim of agency liability against Defendant Royal Bank of Scotland PLC, which was dropped when Plaintiffs voluntarily dismissed Defendant Royal Bank of Scotland PLC.  (*See* ECF No. 66.)  Plaintiffs' agency liability claim is thus no longer before the Court.

[4] Defendant Charter One is the only party to raise the choice of law issue.  (ECF No. 166 at 19 n.9.)  All parties, however, refer to Colorado case law in their briefings on the Motion for Summary Judgment.

significant relationship to the occurrence and parties test expressed in Restatement

(Second) of the Conflict of Laws §§ 145, 171 (1971)" (the "Restatement").  *Id.*

Section 6(2) of the Restatement sets out the following principles to be considered

in resolving choice of law issues:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement, § 6 (1971).  Section 145 of the Restatement further clarifies how these

factors should generally be applied in tort cases, such as the instant matter:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is

centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Id. § 145.

Here, the Court finds that the economic injury at issue in this action occurred in Colorado. Plaintiffs have come forward with evidence that the conduct causing the injury consisted of representations made by Defendants to Agile during the due diligence conducted by Plaintiffs. (*See* Marks Decl. at ¶ 6, ECF No. 177; Marks Depo. at 80:17, 91:17-19, 113:14-16, ECF No. 180-8.) During the due diligence inquiries, Charter One and Swiss Financial assured Agile that Lancelot was as good as it seemed based on returns and assurances that the underlying transactions were legitimate. (*Id.*) These representations came in the form of a telephone call between Eric Fonancier ("Fonancier"), Agile's representative, and Charter One Employee Bernardo Lacayo ("Lacayo") wherein Lacayo expressed confidence in Lancelot. (*See* ECF No. 166 at 10 ¶ 10.) Swiss Financial representatives made similar assurances to Agile, also via telephonic communications. (ECF No. 92 at ¶ 46.) These representations were with an Agile representative, in Colorado, whose business operations were based in Colorado. (*Id.* at ¶ 10; Leavitt Decl. at ¶ 8, ECF No. 70; Marks Decl. at ¶ 5, ECF No. 69.) The Court finds that the places of incorporation and places of business of the parties are so varied that the parties' domicile does not factor into the choice of law analysis.

The Court determines that because the alleged injury to Colorado retirees who invested in Lancelot through their investment in Agile and Sky Bell occurred in Colorado

(*See* ECF No. 67 at 13.), and because the representations were made into Colorado,

Colorado has the most significant relationship to the transactions at issue and the

parties involved in this case.  Therefore, Colorado law will govern the substantive law

issues in this matter.

## MOTIONS TO DISMISS

**BACKGROUND**

On March 12, 2010 Defendant Swiss Financial filed a Motion to Dismiss pursuant

to Rule 12(b)(1) and Rule 12(b)(2) of the Federal Rules of Civil Procedure.  (ECF No.

44.)  Defendant Charter One subsequently filed a Motion to Dismiss on March 23, 2010

pursuant to Rule 12(b)(1) and Rule 12(b)(2), as well as Rule 12(b)(6)[5].  (ECF No. 51).

These motions have been fully briefed and were addressed by the Court during oral

argument on April 25, 2011.  (Courtroom Minutes, ECF No. 214.)  At the hearing,

Defendants' motion to dismiss based on lack of personal jurisdiction (Rule 12(b)(2)),

was denied.  (*Id.* at 2.)  The remaining portions of the Motions to Dismiss were taken

under advisement and reserved for ruling.  (*Id.*)  These issues are currently before the

Court.

**DISCUSSION**

**I.      Rule 12(b)(1) Motion – Subject Matter Jurisdiction**

In their Motions to Dismiss, Charter One and Swiss Financial argue the Court

---

[5] Charter One also argued that the case should be dismissed as against the Royal Bank of Scotland PLC pursuant to Rule 12(b)(5) based on insufficient service of process.  (ECF No. 52 at 9.)  Pursuant to Plaintiff's voluntary dismissal of the Royal Bank of Scotland, ECF No. 66, this portion of the Motion to Dismiss is no longer before the Court.

must dismiss this case under Rule 12(b)(1) based on a lack of diversity of citizenship between the parties.  (ECF No. 45 at 21; ECF No. 52 at 6.)

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter."  Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter.  *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir.1994).  The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction.  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir.1974).  A court lacking jurisdiction "must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking."  *Id.* (citations omitted).

In their opening briefs, Defendants argue that the action must be dismissed based upon a lack of diversity between all plaintiffs and all defendants.  (ECF No. 45 at 21; ECF No. 52 at 6.)  However, since raising this argument, Plaintiffs voluntarily dropped the claims of 10 of the 12 plaintiffs, leaving only Agile and Sky Bell remaining party-plaintiffs in this action.  (ECF No. 61.)  As a result, Defendants no longer contest subject matter jurisdiction.  (*See* ECF No. 75 at 2; ECF No. 74 at 5 n.2.)  To the extent, therefore, that the Motions to Dismiss are predicated on a lack of subject matter jurisdiction, they are DENIED.

## II.     Rule 12(b)(6) Motion – Failure to State a Claim Upon Which Relief Can Be Granted

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must determine whether the allegations of the complaint are sufficient to state a claim within

the meaning of Rule 8(a).  The Court must accept all well-pleaded allegations of the complaint as true. *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 997 (10th Cir. 2002). "However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."  The complaint is reviewed to determine whether it "contains enough facts to state a claim to relief that is plausible on its face."  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th  Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).  "[T]he standard remains a liberal one, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City and County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quoting *Twombly*, 127 S. Ct. at 1965) (internal quotation marks omitted).

The Court has considered all factual allegations in Plaintiffs' Amended Complaint as true for purposes of considering Charter One's Rule 12(b)(6) Motion to Dismiss, and has construed all allegations in the light most favorable to Plaintiffs.  *See McDonald*, 287 F.3d at 997.  For the reasons detailed in the Court's discussion of the motion for summary judgment below, the Court concludes that Plaintiffs have adequately pled facts supporting their allegations that Defendants were negligent and committed negligent misrepresentation in their dealings with Plaintiffs in regard to the Lancelot funds.  The Court further concludes that Plaintiffs have adequately pled facts supporting their Colorado Securities Act claim.  Defendant Charter One has failed to demonstrate that Plaintiffs' allegations in their Amended Complaint are insufficient to state a claim

against it.  Therefore, Charter One's Rule 12(b)(6) Motion to Dismiss is DENIED.

## MOTION FOR SUMMARY JUDGMENT

### PROCEDURAL BACKGROUND

On February 28, 2011 Defendant Charter One filed its Amended Motion for

Summary Judgment.  (ECF No. 166.)  Pursuant to an order issued during oral argument

on March 3, 2011, the Motion was deemed filed on that date.  (ECF No. 177.)

Defendant Swiss Financial filed its Adoption of and Joinder to RBS Citizens's Amended

Motion for Summary Judgment, ECF No. 173, on March 4, 2011.  This motion has been

fully briefed and was addressed by the Court during oral argument on April 25, 2011.

(ECF No. 214.)  At the hearing, Defendants' Motion for Summary Judgment was taken

under advisement and reserved for ruling.  (*Id.* at 2.)  This Motion is currently before the

Court.

### STANDARD OF REVIEW

Summary judgment is warranted under Rule 56(a) when "the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  S*ee Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

248-50 (1986).  A movant who bears the burden at trial must submit evidence to

establish the essential elements of its claim or affirmative defense.  *In re Ribozyme

Pharms., Inc. Sec. Litig.,* 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002).  In contrast, if the

movant "does not bear the ultimate burden of persuasion at trial, it may satisfy its

burden at the summary judgment stage by identifying a lack of evidence for the

nonmovant on an essential element of the nonmovant's claim."  *Bausman v. Interstate*

*Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotations omitted).

The non-moving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *see* Fed. R. Civ. P. 56(e).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

**DISCUSSION**

**I.     Standing**

Defendants' threshold argument in their Motion for Summary Judgment is that the Plaintiffs lack standing to assert any of their three causes of action in this case. (ECF No. 166 at 17-19.)  Defendants claim Sky Bell lacks standing because there is no evidence that it existed at Defendants' alleged misrepresentations.  (*Id.* at 17.) Defendants further claim that Agile lacks standing in this matter because its investments in Lancelot were purportedly already worthless at the time of Defendants' alleged misrepresentations, and thus Agile necessarily suffered no "injury in fact traceable to conduct undertaken or representations made by Charter One.  (*Id.* at 18.)

The Supreme Court has developed a three-part test to analyze standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  "First, the plaintiff must have suffered an 'injury in fact' – an invasion of a legally protected interest which is (a)

concrete and particularized, . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical." ' " *Id.* at 560 (citations omitted). Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not th[e] result [of] the independent action of some third party not before the court.' " *Id.* (citations omitted) (modification in original). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* at 561 (citations omitted).

The plaintiff has the burden of proof to show standing. *Id.* "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. *Id.*

Defendants argue Plaintiffs have no injury, and even if there is an injury, it cannot be related to Defendants' actions. Defendants further argue that Plaintiff Sky Bell was not in existence at the time of the conversations upon which Plaintiffs base their allegations. Plaintiffs allege, however, that they made investment decisions in part based on assurances from Charter One and Swiss Financial. (ECF No. 174 at 9.) Specifically, Agile alleges that it continued to reinvest in Lancelot as a result of the representations Charter One's made to it in 2007 regarding its positive confidence in the ongoing economic viability of Lancelot, given its claimed (but in fact non-existent, according to Plaintiffs) asset-based due diligence audit of Lancelot. (*Id.*) Also as a result of the 2007 communications with Charter One, Agile alleges its affiliates formed

Sky Bell for the specific purpose of further investing in Lancelot.  (ECF No. 174 at 4.)

As the Court must view the record evidence in the light most favorable to the Plaintiffs on this issue, *McBeth*, 598 F.3d at 715, and given that Plaintiffs' investment decisions and their resulting investment losses were based at least in part on communications they had with both Charter One and Swiss Financial, the Court concludes Agile and Sky Bell both have standing to assert again both Defendants the three causes of actions pled in Plaintiffs' Amended Complaint in this action.

## II.    Negligent Misrepresentation

To succeed in their negligent misrepresentation claim, Plaintiffs must establish that (1) in the course of a business, profession, or employment, or in any transaction in which the defendant has a pecuniary interest, (2) the defendant supplied false information (3) for the guidance of others in their business transactions (4) causing the plaintiff pecuniary loss, (5) the plaintiff justifiably relied on the information, and (6) the defendant failed to exercise reasonable care or competence in supplying the information.  Restatement (Second) of Torts § 552(1); *accord*, *Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 72 (Colo. 1991).

Defendants focus their arguments on when Agile made its initial purchase of Lancelot interests and when Sky Bell was formed in arguing for summary judgment. Defendants miss the mark.  At issue is whether Agile relied on statements by Swiss Financial and Charter One in continuing to reinvest returns into Lancelot, whether Agile affiliates relied on those same statements when forming Sky Bell, and whether that reliance was justifiable.  Plaintiffs have come forward with sufficient evidence to create a

triable issue as to whether they justifiably relied on the affirmative assurances of Swiss

Financial and Charter One in making the investment decisions which resulted in the

economic losses at issue here.  (ECF No. 92 at ¶ 44; Marks Decl., ECF No. 177; Marks

Depo. at 80:17, 91:17-22, 113:14-24, ECF No. 180-8; Fonancier Notes Ex. P-13 at 1,

ECF No. 180-13; Fonancier Notes Ex. P-14 at 1, ECF No. 180-14.)  The Court

concludes that with respect to Plaintiffs' claim of negligent misrepresentation, there are

genuine issues of material fact which must be decided by a jury.

### III.    Negligence

To succeed on their negligence claim, Plaintiffs must establish "a duty owed by

the defendant to the plaintiff, a breach of that duty, injury to the plaintiff, and a proximate

cause relationship between the breach and the injury."  *Casebolt v. Cowan*, 829 P.2d

352, 356 (Colo. 1992).  Colorado allows for a duty of care to be created "[w]here one

gratuitously undertakes by promise or conduct to perform acts of service and thereby

causes another to refrain from performing such acts."  *Lester v. Marshall*, 352, P.2d

786, 790 (Colo. 1960).  Whether a defendant has assumed a duty is a mixed question

of law and fact.  *Jefferson County School Dist. R-1 v. Justus*, 725 P.2d 767, 771 (Colo.

1986).  Plaintiffs must show Defendants "undertook to render a service that was

reasonably calculated to prevent the type of harm that befell the plaintiff."  *Id.*  Colo.

Rev. Stat. § 13-21-116 provides immunity from an assumed duty where there is no

compensation.

Defendants argue they did not owe a duty to Plaintiffs in regards to their

assurances pertaining to Lancelot.  Defendants further argue that they were not

compensated for making such assurances, thus triggering application of Colo. Rev. Stat. § 13-21-116.  Here, however, there is some evidence that Defendants' statements induced Plaintiffs to continue investments and begin new investments in Lancelot, thus adding to Lancelot's assets.  (ECF No. 92 at ¶ 44; Marks Decl., ECF No. 177; Marks Depo. at 80:17, 91:17-22, 113:14-24, ECF No. 180-8; Fonancier Notes Ex. P-13 at 1, ECF No. 180-13; Fonancier Notes Ex. P-14 at 1, ECF No. 180-14.)  As a result, the Court finds that there is evidence that Charter One and Swiss Financial were indirectly compensated for their communications.  A factual dispute exists, therefore, regarding whether Colo. Rev. Stat. § 13-21-116 is properly applicable here.  *See Messler v. Phillips*, 867 P.2d 128, 133 (Colo. App. 1993) ("We conclude that [Colo. Rev. Stat.] § 13-21-116 is inapplicable here because defendants' actions did not pertain to "public safety" and were not performed gratuitously as an act of a good samaritan.").

Plaintiffs have presented sufficient evidence to establish genuine issues of material fact as to whether their conversations with Swiss Financial and Charter One caused Agile to reinvest its returns in Lancelot, and caused Agile affiliates to create Sky Bell for the purpose of investing in Lancelot.  Given these factual disputes, Plaintiffs' negligence claim must be decided by a jury.

## IV.    Colorado Securities Act

To succeed in its statutory fraud claim under the Colorado Securities Act, Plaintiffs must establish:

(1) that the plaintiff is a purchaser or seller of a security; (2) that the security is a "security"; (3) that the defendant acted with the requisite scienter; (4) that the defendant's conduct was in connection with the purchase or sale of a security; (5)

that the defendant's conduct was in violation of section 11-51-123 [the predecessor of 11-51-501]; and (6) that plaintiff relied upon defendant's conduct to his or her detriment, or that defendant's conduct caused plaintiff's injury.

*Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095, 1102 (Colo. 1995).

### *Purchaser or Seller & The Holder Doctrine*

Defendant Charter One argues that because Agile was a "mere holder" of securities, there was no connection to a purchase or sale of securities sufficient to trigger the applicability of the Colorado Securities Act to the transactions at issue in this case. (ECF No. 186 at 25.)  *See Seattle-First Nat. Bank v. Carlstedt*, 678 F. Supp. 1543, 1547-48 (W.D. Okla. 1987) ("[L]iability may be premised only upon misconduct that occurs 'in connection with' the purchase or sale of securities.");[6] *but cf. Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("[I]t is enough that the fraud alleged 'coincide' with a securities transaction."). Defendant argues the "holder" doctrine bars an action in which a plaintiff alleges that misrepresentations or omissions caused him to retain ownership of securities acquired prior to the alleged wrongdoing. (ECF No. 186 at 25.)*; see, Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975).

In this regard, Defendants continue to rely on their arguments that Agile last purchased its interests in Lancelot in 2004 – well before it had any communications with Defendants. (ECF No. 166 at 13.)  While Agile does not deny it made initial investments in Lancelot prior to its interactions with Defendants, Agile affirmatively

---

[6] The Court notes that in *Ambraziunas v. Bank of Boulder*, the court stated that "[i]nsofar as the provisions and purposes of the Colorado statute parallel those of the federal enactments, such federal authorities are highly persuasive."  846 F. Supp. 1459, 1464 (D. Colo. 1994).

alleges and has come forward with some evidence that after considerable deliberation it decided to retain its investments in Lancelot, and to increase its financial stake in those funds through monthly decisions to reinvest their investment returns, as a direct result of the alleged misrepresentations made by Defendants.  (*See* ECF No. 174 at 8-9; Decl. of Neal Greenberg, ECF No. 176 at ¶¶ 2-3, 8-13).

In circumstances such as those present here, where a party has shown it was "induced to join, stay in, and to expand its participation" in securities acquired prior to the alleged wrongdoing, at least one court has held this to be evidence sufficient to satisfy the Colorado Securities Act's requirement that there be a causal connection between the alleged misconduct on the part of the defendant and a "purchase or sale" of securities.  *COPIC Ins. Co. v. Wells Fargo Bank, N.A.*, — F. Supp. 2d —, 2011 WL 588500 *17 (D. Colo. Feb. 10, 2011).  Here, Agile alleges that it affirmatively decided to retain investments it made in Lancelot prior to Defendants' alleged misrepresentations, and to increase its financial stake in those funds, "based on the representations" of the Defendants.  *Id.*

As in *COPIC,* the policy concerns underlying the holder doctrine are inapplicable here.  Unlike owners of common stock, Plaintiffs could not buy or sell their interests in Lancelot on an open market at will.  The fact, as in *COPIC*, that Plaintiffs could only redeem their units in Lancelot directly with the funds*,* renders "questions of whether it would have sold its shares far less speculative."  *Id.*  Similarly, quite distinct from cases involving publicly-traded shares, here there were "direct communication[s] and representations between the shareholder and the persons allegedly making the

misrepresentations and other inducements.  This means that the evidence is not simply

a speculative, retrospective analysis of what a shareholder 'would have done.'" *Id.*

Rather, the evidence here could persuade a reasonable jury that Agile had every

intention to redeem its Lancelot investments in early 2007, but not only was dissuaded

from doing so by Defendants' affirmative misrepresentations, it was in fact also induced

to increase its exposure in Lancelot going forward through the reinvestment of its

monthly returns.  On the record before it, the Court concludes the holder doctrine does

not bar Agile's claim under the Colorado Securities Act.

Finally, Defendants argue that Plaintiffs' claim must fail because Plaintiffs did not

purchase or sell Lancelot interests through Defendants.  However, the *Rosenthal*

elements for stating a Colorado Securities Act claim "do not include a privity

requirement."  *In re Qwest Communications Intern., Inc. Securities Litigation*, 387 F.

Supp. 2d 1130, 1153 (D. Colo. 2005).  The Act does not require that "plaintiff alleges

that the plaintiff purchased or sold a security from or to the defendant."  *Id.* at 1152.  The

Court therefore rejects this argument.

The Court finds Plaintiffs have presented sufficient evidence to establish a

genuine issue of material fact on their Colorado Securities Act claim such that it, too,

must be decided by a jury.

### *Statute of Limitations*

The Colorado Securities Act precludes initiation of suit "more than five years after

the purchase or sale" of securities.  Colo. Rev. Stat. § 11-51-604(8).  Defendants argue

that because Agile last purchased Lancelot shares on November 1, 2004, the Colorado

Securities Act claim should be time-barred.  (ECF No. 166 at 32.)  In response, Agile

argues that it made continued investments in Lancelot through 2008.  (ECF No. 174 at

35.)  Because there are issues of fact that must be decided by a jury, summary

judgment based on the Act's limitations period is inappropriate at this time.

## CONCLUSION

In accordance with the findings and analysis set forth above, the Court hereby

ORDERS as follows:

1)      Swiss Financial's Motion to Dismiss, ECF No. 44, is DENIED;

2)      RBS Citizens's Motion to Dismiss the Amended Complaint, ECF No. 51, is

DENIED; and

3)      RBS Citizens and Swiss Financial's Motion for Summary Judgment, ECF

No. 166, is DENIED.

Dated this 31st day of May, 2011.

BY THE COURT:

William J. Martínez
United States District Judge