IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:09-cv-02786-RBJ-BNB

AGILE SAFETY VARIABLE FUND, L.P. and
SKY BELL SELECT LP,

    Plaintiffs,

v.

RBS CITIZENS, N.A. d/b/a CHARTER ONE BANK, et al.,

    Defendants.

---

### RBS CITIZENS, N.A.'S RENEWED MOTION FOR SUMMARY JUDGMENT

---

**Introduction**

In this proceeding, professionally managed hedge fund Agile Safety Variable Fund, L.P. ("ASVF") sues a bank with which it had no relationship -- RBS Citizens, N.A. d/b/a Charter One ("Charter One") -- to recover losses the hedge fund suffered on investments it made in another hedge fund -- Lancelot Investors Fund, L.P. ("Lancelot") -- which turned out to be part of a Ponzi scheme. During discovery, ASVF made two critical admissions that, when coupled with the complaint's necessary allegation that the Ponzi scheme rendered Lancelot worthless from the beginning, demonstrated that Charter One did not cause ASVF's losses: (1) ASVF made all its investments in Lancelot during 2004, and (2) Charter One's alleged misrepresentations concerning Lancelot upon which ASVF's claims are based were made in July 2007, i.e., three years after ASVF's investments. Charter One accordingly moved for

summary judgment because its alleged misrepresentations necessarily could not have caused the losses that ASVF suffered years earlier when it purchased worthless securities.

To oppose summary judgment, ASVF submitted a declaration from its professional manager, Neal Greenberg, that was carefully crafted to suggest, contrary to earlier responses to written discovery, that ASVF actually made further investments after Charter One's alleged July 2007 representations. Specifically, the declaration implied, though did not go so far as to aver, that (i) ASVF invested in a "derivative contract" offered by a financial institution known as "KBC" that included interests in Lancelot, and (ii) ASVF "reinvested" reported returns on its original investments every month.

The Honorable William J. Martinez (who was then presiding over this proceeding) concluded that the implications in Mr. Greenberg's declaration were sufficient to create "issues of fact" regarding the timing of ASVF's investments that precluded summary judgment. Magistrate Judge Boland then recognized that the declaration, so interpreted, was "inconsistent -- or at least appear[ed] to be inconsistent with other discovery responses previously given," and ordered supplemental discovery into Mr. Greenberg's assertions.

That supplemental discovery has now taken place. It revealed that there are no "issues of fact" after all because it showed that ASVF made no investments in Lancelot following Charter One's alleged July 2007 representations. Specifically, Plaintiffs and Mr. Greenberg admitted (a) that ASVF put no money into KBC after 2006 and they know of no investments by KBC in Lancelot at all, and (b) that ASVF did not otherwise put money into Lancelot after July 2007, as ASVF's asserted monthly "reinvestments" in Lancelot were nothing more than ASVF's share of Lancelot's purported increased net asset value each month from

2

interest that Lancelot supposedly made on its loans to Petters, which Greenberg admitted was not really earned by Lancelot because the claimed interest was false at the time.  In short, it is now clear that the very lynchpin ASVF used to avoid summary judgment -- Mr. Greenberg's declaration -- does not allow ASVF to meet its burden of coming forward with competent evidence sufficient to show a genuine dispute as to whether ASVF made any investments after July 2007 because the declarant himself has no such evidence.  Accordingly, Charter One is entitled to summary judgment on all ASVF's claims.  Charter One respectfully requests oral argument.

## Background

In 2001, Chicago-area money manager Greg Bell formed Lancelot, which, through the purchase of promissory notes, provided short-term financing to entities owned or controlled by Minnesota businessman Thomas J. Petters (the "Petters Entities") that purported to purchase overstock consumer electronics inventory from suppliers and to resell such merchandise to large discount retailers such as Costco.  (Docket No. ("Dkt.") 92 ¶ 2.)  Beginning in 2003, professional money management company Agile Group, LLC ("Agile") caused several of the hedge funds it managed to invest in Lancelot, as well as in other hedge funds (variously named Palm Beach Finance Partners ("Palm Beach"), Eden Rock Finance Fund, Arrowhead, and

Stewardship) that, like Lancelot, provided financing to the Petters Entities.[1] On March 1, 2004, ASVF made its first investment in Lancelot.[2] On April 1, 2004, May 1, 2004, July 1, 2004, and November 1, 2004, ASVF made additional investments in Lancelot that, together with its first investment, totaled $9 million.[3] By July 1, 2007, Agile had caused the funds it managed to purchase nearly $105 million in the Lancelot and Palm Beach funds alone,[4] all without having ever communicated with Charter One or Lancelot's or the other hedge funds' lenders.[5]

Agile's commitment to Lancelot and Petters has led to its principal, Neal Greenberg, being charged with fraud and breach of fiduciary duty by the U.S. Securities and Exchange Commission, which found that he marketed ASVF and other hedge funds as highly diversified and risk-insulated even though nearly half of investor capital was concentrated in Petters-related investments by September 30, 2008.[6] Agile and Greenberg have also been sued

---

[1] Dkt. 92 ¶ 40; Dkt.167-12 at AG002801; Dkt. 167-2 at AG015871 (listing Lancelot, Palm Beach, Arrowhead, and Stewardship as funds working with Tom Petters); Dkt. 167-3 at AG016324-016331; Dkt. 167-4 at 167:19-168:7; Dkt. 167-5 at 61:24-62:3. To avoid overburdening the Court with paper, Charter One is not resubmitting exhibits that were filed with its earlier summary judgment papers or with other filings. Similarly, in lieu of repeating the statements of undisputed facts included in the earlier summary judgment papers, Charter One hereby incorporates by reference those summary judgment papers -- which consist of Charter One's motion (Dkt. 166), reply brief (Dkt. 186), and accompanying declarations (Dkt. 167, 168, 187) -- to the extent necessary to comply with D.C.COLO.LCivR 56.1A. If, however, the Court would find it more convenient for all exhibits that are cited in connection with this renewed motion to be resubmitted, and/or for a new statement of undisputed facts to be filed, Charter One would be pleased to do so.

[2] Dkt. 167-12 at AG002800.

[3] Dkt. 167-12 at AG002800.

[4] Dkt. 167-12 at AG002799-2804; Dkt. 167-3 at AG016324-AG016331.

[5] Dkt. 167-6 at AG000076-88; Dkt. 167-7 at AG000271-87; Dkt. 167-5 at 59:10-61:7.

[6] Dkt. 187-10.

4

by their hedge funds' <u>investors</u> for the losses suffered on their investments in Lancelot and other investments.[7]

Charter One is a commercial bank that had no relationship with Lancelot prior to 2005. At that time, Bernie Lacayo, who had worked at Lancelot's primary bank, joined Charter One. In 2006, Lancelot and related funds opened lines of credit with Charter One (first for $25 million; then, by July 2006, for $50 million).[8] On or about July 31, 2007, one of Agile's due diligence agents, Eric Fonacier, allegedly contacted Mr. Lacayo by telephone and email.[9] During the course of those unsolicited communications (the only communications between anyone associated with either Plaintiff and Charter One),[10] Lacayo allegedly misrepresented the level of integrity of Lancelot's management, the nature and extent of Charter One's due diligence into Lancelot, and, in one instance, the results of its due diligence.[11] ASVF also alleges that Charter One invited Mr. Fonacier to contact Charter One thereafter for updates on Charter One's due diligence,[12] but it is undisputed that neither Mr. Fonacier nor anyone else associated with either Plaintiff ever again contacted Charter One to seek such updates or for any other

---

[7]     Dkt. 187-12; Dkt. 187-13.

[8]     Dkt. 167-1 at COB018500.

[9]     Dkt. 92 ¶ 48; Dkt. 167-14 at AG000016-17; Dkt. 167-15 at AG001264, AG000335, and AG000336.

[10]    Dkt. 168-6 at 4.

[11]    Dkt. 92 ¶ 47. While the content of the communications is the subject of dispute (Charter One's position is that Mr. Lacayo made no misrepresentations, and that Charter One lost more than $40 million on its loans to Lancelot because it, like Plaintiffs, was unaware of the fraud), that dispute is not over facts that are material for purposes of this motion because, even if Plaintiffs' version of those communications is correct, other facts in the case as to which there is no genuine dispute entitle Charter One to judgment as a matter of law.

[12]    Dkt. 92 ¶ 48.

reason. It is also undisputed that neither Plaintiff had any relationship with Charter One before or after the alleged July 2007 communications.[13]

Nearly a year later, in late September 2008, Mr. Petters' business was exposed as a Ponzi scheme that had operated since 1995.[14] Upon discovery of the scheme, the Petters Entities defaulted on their loans from Lancelot and other lenders, and the Lancelot funds in turn defaulted on their lines of credit with Charter One, costing Charter One tens of millions of dollars.[15] Petters has since been convicted and sentenced to 50 years in prison for the scheme, and in July 2009 Bell pled guilty to committing wire fraud in connection with Petters' notes in 2008. (Dkt. 92 ¶¶ 52, 54, 56; Dkt. 168-25.) ASVF admitted in its complaint that, throughout the period in question, the Petters operation in which Lancelot invested virtually all its capital was a fraud that rendered the interests of Lancelot's investors worthless. (See Dkt. 92 ¶ 5 ("Virtually every Petters transaction Lancelot bought was fake . . . . Petters -- with Lancelot and Bell's assistance -- operated a massive Ponzi scheme that left investors like Agile holding worthless notes in excess of $230 million"); see also id. ¶¶ 49, 51-53.)

On November 30, 2009, ASVF and other plaintiffs commenced the above-captioned action seeking to recover from, inter alia, Charter One the losses they allegedly suffered on their Lancelot investments. Following certain amendments to the complaint,

---

[13] The other Plaintiff -- Sky Bell Select LP ("Sky Bell") -- never communicated with Charter One at any time. Charter One believes that undisputed fact and others prevent Sky Bell from having any viable claims against Charter One, and respectfully believes the May 31, 2011 order denying summary judgment against Sky Bell was in error.

[14] Dkt. 92 ¶¶ 51-52; U.S. Securities and Exchange Commission v. Thomas J. Petters et al., 09-cv-01750 (Doc. No. 1) (D. Minn. 2009).

[15] See Amended Verified Complaint, RBS Citizens, N.A. v. Lancelot Investors Fund L.P. et al., No. 08-CH-37272, Circuit Court of Cook County, Illinois (October 9, 2008) (Dkt. 168-8).

Plaintiffs assert theories of common law negligent misrepresentation and negligence, and securities fraud under the Colorado Securities Act.

## Argument

1.     Plaintiffs Admitted During Discovery That ASVF
   Made No Investments After the Alleged Representations.

Plaintiffs alleged in their complaint (Dkt.. 92 ¶ 40) and admitted during discovery that ASVF's purchases of Lancelot took place in 2004, and that ASVF did not make any purchases in Lancelot after Charter One's only alleged representations, at the end of July 2007. On October 29, 2010, in response to a Fed. R. Civ. P. 36 Request for Admissions, Plaintiffs affirmatively admitted that "as of July 2007 Agile Safety Variable Fund already owned Lancelot limited partnership units and did not purchase any additional units after July 2007."[16] Plaintiffs also produced a one-page document, labeled AG002800, showing ASVF's purchases of Lancelot, all of which were in 2004:

| Date | Redemption Amt | Subscription Amt | Residual Balance |
|---|---|---|---|
| 3/1/2004 | | $1,000,000 | $1,000,000 |
| 4/1/2004 | | $2,000,000 | $3,011,024 |
| 5/1/2004 | | $3,000,000 | $6,043,461 |
| 7/1/2004 | | $1,000,000 | $7,177,168 |
| 11/1/2004 | | $2,000,000 | $9,534,596 |
| 12/31/2004 | | | $9,743,453 |
| 12/31/2005 | | | $11,197,625 |
| 12/31/2006 | | | $12,742,211 |
| 12/31/2007 | | | $14,649,153 |
| 9/30/2008 | | | $16,065,097 |

---

[16]     Plaintiffs' Response to Defendant's First Set of Requests for Admission at 6 (Response to Request No. 10) (Oct. 29, 2010) (emphasis added) (Dkt. 168-24).

7

(Dkt. 167-12 at AG002800.) Further, in response to two distinct interrogatories, Plaintiffs represented that ASVF's purchases of Lancelot, "including any re-investment of returns," all appeared on that document.[17]

Relying on those admissions, Charter One moved for Summary Judgment. (Dkt. 166.) Because the only asserted communications between either Plaintiff and Charter One occurred in July 2007, the three-year gap between ASVF's investments and its alleged communications with Charter One precluded that Plaintiff from proving the required elements of injury-in-fact, causation, and reliance.

2.  ASVF Avoided Summary Judgment By Submitting A Declaration Suggesting It Made Some Investments In Lancelot After Charter One's Alleged Representations.

In apparent recognition of the fatal flaw in their claims, Plaintiffs attempted to create a factual issue by submitting a declaration from Mr. Greenberg that was carefully crafted to obscure the relative timing of ASVF's Lancelot investments and the one abbreviated alleged communication with Charter One. Plaintiffs opposed Charter One's summary judgment motion, relying largely on a brand new declaration from ASVF's portfolio manager, Neal Greenberg, saying he "decide[d]" to reinvest supposed Lancelot returns and to purchase a "derivative contract with KBC" that had exposure to Lancelot. (Dkt. 176 ¶¶ 2, 13.) The declaration asserted that "ASVF relied on the representations by Charter One to decide not only to not redeem its investment, but also to maintain that investment in Lancelot, to continue to invest its returns in Lancelot each month" after July 2007, and "to maintain and increase its exposure to Lancelot"

---

[17] Plaintiffs' Responses to Defendant Citizen Financial Group, Inc.'s First Set of Interrogatories at 5 (Response to Interrogatory No. 6) (July 7, 2010) (Dkt. 168-6); Plaintiffs' Responses to Defendant's Second Set of Interrogatories at 6 (Response to Interrogatory No. 5) (Sept. 17, 2010) (Dkt. 168-23); Dkt. 167-12 at AG002800.

(id. ¶ 13), and that, from 2004 to 2008, Agile "made the investment decision to increase ASVF investments in Lancelot limited partnerships through our derivative contract with KBC" (id. ¶ 2).

With respect both to the KBC "derivative contract" and the supposed reinvestments, the declaration stopped short of asserting that ASVF actually made post-July 2007 investments, but instead created the impression of such investments in an apparent effort to cloud the skies sufficiently to avoid summary judgment. For example, with respect to the asserted derivative contract, the declaration stated that, during the 2004-2008 period, "we made the investment decision to increase ASVF investments in Lancelot limited partnerships through our derivative contract with KBC. For example, if on January 1, we had $20 million in the derivative, with 10% being Lancelot, and we put another $2 million into the derivative, then we would have bought an additional Lancelot exposure of approximately $180,000 through our $2 million addition to the derivative contract with KBC." (Id. (emphasis added).) The declaration nowhere stated that ASVF actually did put any money into any derivative contract after July 2007, or that any KBC actually purchased Lancelot interests to underlie any derivative contract. Likewise, with respect to reinvestments, the declaration stated that additional interests in Lancelot "could be purchased by investing returns obtained," that ASVF's management "determined whether" to reinvest earnings, and that the managers "made the investment decisions to increase our exposure to Lancelot," without ever saying that any returns actually ever were reinvested by ASVF. (Dkt. 176 ¶ 2 (emphasis added).)

Nevertheless, the suggestions in the artfully crafted declaration caused Judge Martinez to conclude there might be a factual issue regarding when ASVF purchased its interests in Lancelot. On May 31, 2011, he issued an Opinion and Order denying the motion for summary

9

judgment, in large part on the ground that, through the assertions in Mr. Greenberg's declaration, Plaintiffs had "come forward with some evidence" of "monthly decisions to reinvest their investment returns." (Dkt. 215 at 15-16, 18, 20-21, 22.)

3.  Supplemental Discovery Has Demonstrated That ASVF
    Actually Made No Lancelot Investments After Charter One's Alleged Representations.

Recognizing that Plaintiffs had produced no documentary support for the claims in Mr. Greenberg's declaration despite having previously been ordered to produce documents that would have included any such material, Charter One moved under Fed. R. Civ. P. 37 for additional discovery relating to the declaration's claims. Magistrate Judge Boland found that "the affidavit of Mr. Greenberg is inconsistent -- or at least appears to be inconsistent with other discovery responses previously given," and ruled that "the affidavit constitutes good cause to allow additional discovery to occur." (Dkt. 260-25 at 49-50.) He then allowed Charter One supplemental discovery in the form of five additional document requests, interrogatories, and requests for admission, and a supplemental deposition of Mr. Greenberg. (Dkt. 240.) The supplemental discovery concluded on November 11, 2011.

The supplemental discovery produced new evidence, which did not exist at the time the earlier summary judgment motion was briefed and decided, that revealed that ASVF did not purchase any Lancelot interests after Charter One's alleged July 2007 representations. In short, now that the declaration has been held up to the scrutiny of the supplemental discovery, the cloudy picture Plaintiffs had created with it has been made clear: there is no genuine dispute that ASVF made no investments in Lancelot after the July 2007 alleged representations.

First, with respect to the supposed "derivative contract" with "KBC," Plaintiffs admitted in response to interrogatories that ASVF's only cash transfer to KBC under the

10

derivative contract was on March 1, 2006 -- more than a year before Charter One's alleged representations -- and that they are not aware of any investments in Lancelot by KBC on behalf of ASVF.  (See Ex. A to the Declaration in Support of RBS Citizens, N.A.'s Renewed Motion For Summary Judgment submitted herewith ("Decl.") at 3 (Supplemental Response to Interrog. 1: "Plaintiffs made no cash or other investments in KBC.  Plaintiffs had derivative contracts with KBC and paid $30 million in cash to KBC on or about March 1, 2006."); Decl. Ex. B at 4 (Resp. to Interrog. 2: "Plaintiffs are not aware of investments in Lancelot by KBC on behalf of Agile Safety Variable Fund, L.P.").)  Moreover, while his declaration suggested that ASVF increased its investment in Lancelot throughout the 2004-2008 period by putting money into a KBC derivative contract that had Lancelot as an underlying security,[18] Mr. Greenberg admitted during his supplemental deposition that he does not know whether ASVF ever actually bought additional Lancelot exposure through a derivative contract with KBC (see Decl. Ex. C at 503:2-15 ("Q:  Did KBC buy any more shares of Lancelot as a result of that investment decision?  A:  I don't know.  Q:  Did KBC pay cash to Lancelot as a result of that investment decision?  A:  I don't know.  Q:  Did ASVF pay cash to KBC as a result of that investment

---

[18]   See Dkt. 276 ¶ 2 ("Throughout the period from 2004 to 2008, . . . we made the investment decision to increase ASVF investments in Lancelot limited partnerships through our derivative contract with KBC.  For example, if on January 1, we had $20 million in the derivative, with 10% being Lancelot, and we put another $2 million into the derivative, then we would have bought an additional Lancelot exposure of approximately $180,000 through our $2 million addition to the derivative contract with KBC." (emphasis added)).

11

decision? . . . . A: No.").[19] In fact, Mr. Greenberg later admitted that KBC was simply a lending facility (see Decl. Ex. C at 532:12-15, 533:13-25, 534:15-20, 536:5-12) that never purchased units in any hedge fund but, instead, had units of hedge funds pledged to it by ASVF (id. at 537:25 - 538:4 ("A: I don't believe KBC purchased any units of any hedge funds in connection with this facility. Q: Units were pledged to KBC in return for a loan? A: Yes, that sums it up."). Because Mr. Greenberg's declaration is Plaintiffs' only evidence suggesting any KBC transaction might have amounted to a post-July 2007 investment, his admitted lack of knowledge as to whether ASVF ever actually bought additional Lancelot exposure through it means that there is no factual issue regarding it that could preclude summary judgment.

Second, Mr. Greenberg admitted in his supplemental deposition that ASVF made no new Lancelot subscriptions -- that is, did not actually put any new money into Lancelot -- during 2007 or 2008. During his November 8, 2011 supplemental deposition, Mr. Greenberg was shown copies of ASVF's capital account statements from Lancelot, which showed that ASVF made no "Additions" to its Lancelot investments during 2007 or 2008 (see Decl. Exs. D, E), and he testified that "Additions" referred to "new subscriptions" in Lancelot, which, he explained, were situations where ASVF "actually put new money into the fund." (See Decl. Ex. C at 417:11-21 (explaining that Additions "would correspond to new subscriptions, where we actually put new money into the fund").) He further admitted that the supposed

---

[19] See also Decl. Ex. C at 503:23 - 504:13 ("Q: I[t] says, the next sentence, 'For example, if on January 1, we had $20 million in the derivative, with 10% being Lancelot, and we put another $2 million into the derivative, then we would have bought an additional Lancelot exposure of approximately $180,000 through our $2 million addition to the derivative contract with KBC.' [¶] Is that a true statement, sir? A: Yes. Q: Did that, in fact, happen in '04 through '08? A: I don't know. Q: Did there ever come any point where ASVF put additional money in the derivative contract during 2006 through 2008 with KBC? A: I don't know.").

12

"reinvestments" of purported Lancelot returns appeared in the "Income/(Loss)" row of the account statements and consisted simply of ASVF's share of Lancelot's supposedly increased net asset value each month from income Lancelot claimed to have earned. Using the example of ASVF's 2008 Lancelot account statement (see Decl. Ex. E), which showed monthly "Income" of $184,291.74, he explained that, in his view, monthly accretions in the value of ASVF's Lancelot investment due to interest income that Lancelot claimed to earn from its business of loaning money to Petters were "reinvestments":

> Q: If there was an increased investment in August, should it be in additions?
>
> A: Not necessarily.
>
> Q: Where would it be if it's not in additions on the income statement?
>
> A: Well, under income.
>
> Q: I understand the concept of income. You made money that month?
>
> A: Yes.
>
> \* \* \*
>
> Q: So the investment accreted 184,291.74, right, for the month?
>
> A: If this statement is correct, yes.
>
> Q: You say that's the 184 that was <u>reinvested</u>?
>
> A: Yes.

(Decl. Ex. C at 431:7-15; 432:7-12 (emphasis added).) Likewise, when discussing the 2004 Lancelot account statement (Decl. Ex. F), which showed "Additions" of $9 million (i.e., the exact amount of ASVF's subscriptions that year), Mr. Greenberg testified that what he calls

"reinvestments" were nothing more than the amounts of Lancelot's purported increases in net asset value from interest it claimed to have earned from Petters:

> Q: How did the fund make or lose money in connection with the month of December '04?
>
> A: Well, they claimed they were earning interest from receivables.
>
> Q: "They" being Lancelot Investors Fund, LP?
>
> A: Yes.
>
> Q: And that income is reflected in the change in the net asset value of Lancelot Investors Fund, LP?
>
> A: Yes, that's correct.
>
> \* \* \*
>
> Q: It rose because it earned income which then caused the net asset value to increase?
>
> A: Yes.
>
> \* \* \*
>
> Q: Why did the net asset value of Lancelot go up in '04?
>
> A: Because they earned interest on their business, or purported to earn interest on their business.
>
> \* \* \*
>
> Q: In connection with the reinvestments or the increased investments in '04, other than $9 million, was any of the payments made in cash by Agile Safety Variable fund?
>
> A: I don't know.
>
> Q: Where are the <u>reinvestments</u> reflected on Exhibit 272 or the increase in investments beyond the $9 million? [Objection omitted]

14

> A: It appears it's on the third line there where it says income and loss.

(Tr. at 444:3-12; 444:21-23; 446:16-20; 447:9-19 (emphasis added).)

The mere appreciation in value of securities one already owns, however, obviously does not amount to a purchase upon which one can base a claim. See Ahearn v. Gaussoin, 611 F. Supp. 1465, 1479 (D. Ore. 1985) (rejecting plaintiff investors' argument that, by waiving the right to immediate payment of monthly interest payments, they were "'reinvesting' the amount of accrued interest," and holding that the "monthly interest payments were not 'purchases'" or "new investment decision[s]" as to which plaintiffs could assert claims). That is true with even greater force here, where the claimed interest income was not really earned by Lancelot because, as Mr. Greenberg admitted, Lancelot's claimed earnings were false at the time. (See Decl. Ex. C at 466:5-8 ("Q: As you sit here today, do you believe that, in fact, that interest income was really earned by Lancelot Investors Fund? A: Well, no."); id. at 466:25 - 467:2 ("In retrospect as I'm sitting here today, I can see that what they claimed -- I believe what they claimed was false at the time.")) Stated differently, Plaintiffs cannot recover for losses they suffered on "reinvestments" of Lancelot "returns" because the very "returns" they claim to have "reinvested" were fictitious.

Accordingly, irrespective of whether it was proper for the Court to have allowed Plaintiffs' post-discovery declaration from Mr. Greenberg to create an issue of fact with their own discovery admissions,[20] the supplemental discovery shows unequivocally that there is no issue of fact after all because Plaintiffs and the author of the declaration by which they earlier

---

[20] Tenth Circuit precedent indicates it was not, see Dixon v. Kirkpatrick, 553 F.3d 1294, 1302-03 (10th Cir. 2009) (holding that request for admission response was binding against party that later sought to deny it on summary judgment).

15

avoided summary judgment have admitted that ASVF made no investments in Lancelot after July 2007.

4.      Charter One Is Entitled To Judgment As A Matter Of Law Against ASVF.

The legal implication of Plaintiffs' and Mr. Greenberg's admissions is clear. Universal law recognizes that mere holders of already worthless securities at the time of the alleged misrepresentations cannot establish causation[21] or the "injury in fact . . . fairly traceable to the challenged action of the defendant" needed to confer standing[22] because their losses had already occurred prior to the defendants' asserted misconduct. See, e.g., Crocker v. FDIC, 826 F.2d 347, 350, 351 n.6 (5th Cir. 1987) (ruling that holders had no standing based on not selling their artificially inflated stock for a profit or to minimize their loss because "[i]t is too much to ask the court to recognize an injury based on a lost profit to which no one was lawfully entitled"); see also Arent v. Distribution Sciences, Inc., 975 F.2d 1370, 1374 (8th Cir. 1992) ("Plaintiffs argue that they would have sold their . . . stock had they known that the merger would not occur. But if everyone had known this adverse fact, then the stock's value would have reflected the adversity. Only if plaintiffs were the only ones [defendant] told, so that they could have improperly traded on inside information in dealing with third party purchasers, would disclosure have aided their investment fortunes."); Dloogatch v. Brincat, 920 N.E.2d 1161, 1171 (Ill. App. 2009) (ruling that holders of securities that had already declined in value by time of

---

[21]     Causation is a required element for each of Plaintiffs' causes of action. (See Dkt. 166 at 14, 17 n.12, 23-24 & n.30, 25.)

[22]     Bronson v. Swensen, 500 F.3d 1099, 1106, 1109 (10th Cir. 2007) (internal quotation marks omitted).

alleged misrepresentations could not allege causation because "plaintiffs could not have sold their stock at the artificially high price absent the fraud").

Likewise, where the allegedly fraudulent conduct occurs after the purchase or sale, it is not "in connection with" the purchase or sale of a security. See Arst v. Stifel, Nicolaus & Co., Inc., 86 F.3d 973, 977 (10th Cir. 1996); Seattle-First Nat'l Bank, 678 F. Supp. at 1547-48 (activities after plaintiff's purchase cannot form basis of liability under Rule 10b-5 (collecting cases)); see also Ambraziunas v. Bank of Boulder, 846 F. Supp. 1459, 1464 (D. Colo. 1994) ("Insofar as the provisions and purposes of the Colorado statute parallel those of the federal enactments, such federal authorities are highly persuasive."). A required element of Plaintiffs' Colorado Securities Act claims is that the defendant's conduct was in connection with the purchase or sale of securities.[23]

This past winter's decision in COPIC v. Wells Fargo Bank, N.A., 767 F. Supp. 2d 1191 (D. Colo. 2011), is not to the contrary. Judge Martinez relied on that decision in denying summary judgment as to ASVF's statutory claim, saying the case addressed the level of evidence needed "to satisfy the Colorado Securities Act's requirement that there be a causal connection between the alleged misconduct on the part of the defendant and a 'purchase or sale' of securities." (Dkt. 215 at 20.) The plaintiff in that case, however, identified a specific one-week period when it wanted to exit its investment but the defendants' alleged misrepresentations persuaded it not to, 767 F. Supp. 2d at 1200-01, and the investment declined in value thereafter, see id. at 1200, 1203 & n.11 (showing plaintiff's unrealized losses increasing from $830,000 to

---

[23] See Colo. Rev. Stat. § 11-51-501(1); Huffman v. Westmoreland Coal Co., 205 P.3d 501, 505 (Colo. App. 2009) (quoting Rosenthal v. Dean Witter Reynolds, Inc., 908 P.2d 1095, 1102 (Colo. 1995)).

$8 million). Here, in contrast, ASVF's investment in Lancelot necessarily did not decline in value after Charter One's alleged representations because its value was already zero. See supra p. 6.[24]

Finally, because the Colorado Securities Act includes a statute of repose that bars any action brought "more than five years after the purchase or sale" of securities, Colo. Rev. Stat. § 11-51-604(8), and Plaintiffs commenced this action five years and one month after ASVF's final purchase of Lancelot interests on November 1, 2004, Plaintiffs' and Mr. Greenberg's admissions in the supplemental discovery show that ASVF's Colorado Securities Act claim is barred on that ground as well.

**Conclusion**

Judge Martinez concluded that Mr. Greenberg's declaration created issues of fact that allowed ASVF to avoid summary judgment, but now that the supplemental discovery has clarified what that ambiguous submission really means, it is apparent that there are no genuine issues of fact. The declarant himself has admitted that ASVF put no new money into Lancelot, that he does not know of ASVF's making any investments in Lancelot through KBC, and that the

---

[24] Thus, the undisputed facts here would not permit ASVF to avoid summary judgment under Colorado law, which precludes claims by mere holders even of securities that, unlike Lancelot, actually decline in value after the alleged misrepresentations, absent facts "tending to demonstrate actual reliance," Ohanessian v. Pusey, No. 09-cv-0113, 2010 WL 728549, at *1 n.2 (D. Colo. Feb. 25, 2010). The same is true under Illinois law, which Judge Martinez erroneously found not to apply (in part by looking to the residency of ASVF's underlying investors, who are not parties to this proceeding, despite that not being among Colorado's choice-of-law factors, see Dkt. 215 at 8-10). See Dloogatch, 920 N.E.2d at 1167-69 (noting that Plaintiffs had not cited "any cases from any jurisdiction in which a court has both recognized a 'holder claim' and upheld such a claim as viable past the pleading stage," and affirming dismissal of holder claim because, inter alia, plaintiffs' allegation that they "'relied' without more is simply a conclusory statement that gives no insight into facts that plaintiffs would ever be able to prove supporting that claim," and explaining they "must allege actions, as distinguished from unspoken and unrecorded thoughts and decisions") (internal quotations marks omitted).

supposed reinvestments of Lancelot's fictitious returns were nothing more than ASVF's retention in its capital account of the amounts by which Lancelot's net asset value reportedly, but fictitiously, increased.  Those admissions are consistent with Plaintiffs' prior judicial admission that "as of July 2007 Agile Safety Variable Fund already owned Lancelot limited partnership units and did not purchase any additional units after July 2007."  See supra p. 7.  As a result, ASVF has failed to come forward with evidence to meet its burden of showing any genuine dispute as to that critical fact.  Accordingly, Charter One is entitled to judgment as a matter of law under Fed. R. Civ. P. 56(a) because ASVF has failed to present evidence by which it could prove the injury-in-fact and causation necessary to establish standing and to support its claims against Charter One.

Dated:  December 12, 2011

Respectfully submitted,

/s/ Howard Schiffman
Howard Schiffman
Eric A. Bensky
Schulte Roth & Zabel LLP
1152 15th Street N.W. Suite 850
Washington, D.C. 20015
Telephone: (202) 729-7470
Facsimile: (202) 730-4520
E-Mail:  howard.schiffman@srz.com
E-Mail:  eric.bensky@srz.com
*Counsel for Defendant RBS Citizens, N.A.*

## **Certificate of Service**

I hereby certify that on this 12th day of December, 2011, I electronically filed RBS Citizens, N.A.'s Renewed Motion for Summary Judgment with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to each of the following:

| Plaintiffs' Attorneys: | Attorneys for Swiss Financial Services, Inc.: |
|---|---|
| Steven W. Thomas<br>Thomas, Alexander & Forrester LLP<br>14-27th Ave<br>Venice, CA 90291<br>steven.thomas@tafattorneys.com | Robert B. Christie<br>Henderson & Lyman<br>175 West Jackson Blvd, Suite 240<br>Chicago, IL 60604<br>rchristie@henderson-lyman.com |
| Steven M. Feder<br>Feder Law Firm<br>730 17th Street, Suite 550<br>Denver, CO 80202<br>steve@federlawfirm.com | Holly Stein Sollod<br>Brooke Harrison McCarthy<br>Holland & Hart LLP<br>555 17th Street, Suite 3200<br>Denver, CO 80202<br>hsteinsollod@hollandhart.com<br>bhmccarthy@hollandhart.com |

/s Eric A. Bensky
Howard Schiffman
Eric A. Bensky
Schulte Roth & Zabel LLP
1152 15th Street N.W., Suite 850
Washington, DC  20005
Telephone:  202-729-7470
E-Mail:  howard.schiffman@srz.com
E-Mail:  eric.bensky@srz.com

Counsel for Defendant RBS Citizens, N.A.